<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| RAQUEL GARAJAU,<br><br>     Petitioner,<br><br>  v.<br><br>ERICA STERN, *et al*<br>*in her official capacity as Administrator of*<br>*Edna Mahan Correctional Facility for Women*<br><br><br>     Respondents. | Civil Action No. 22-5213 (GC)<br><br><u>**OPINION**</u> |

<u>**CASTNER, District Judge**</u>

  **THIS MATTER** comes before the Court on a petition for a writ of habeas corpus (Petition) pursuant to 28 U.S.C. § 2254 (§ 2254) filed by Petitioner Raquel Garajau through counsel. (ECF No. 1.) Petitioner filed a brief in support of the Petition (ECF No. 1-1), and Respondents answered the Petition (ECF No. 6). Petitioner seeks relief from the New Jersey state courts' denial of her claim that the evidence was insufficient to support her weapon-related convictions, including a conviction for felony murder. (*See* ECF No. 1-1.) Petitioner initially failed to present that claim to the New Jersey Supreme Court. (*See* ECF No. 6.) In their response (*id.*), Respondents raised exhaustion as a defense to Petitioner's insufficiency challenge (*see id.*), and the Court granted Petitioner's unopposed motion to stay the case to permit exhaustion (*see* ECF No. 8). After Petitioner exhausted her opportunities for state relief, the Court granted Petitioner's unopposed motion to reopen. (*See* ECF No. 15.) Respondents filed a supplemental response to the Petition

(ECF No. 16), and Petitioner submitted a reply to their supplemental response (ECF No. 17).  The Court has carefully considered the parties' submissions.  For the reasons set forth below, and other good cause shown, the Petition is **DENIED**, and a certificate of appealability shall issue.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

Petitioner's state court criminal convictions derive from her role in the death of Trupal Patel, who was shot during an armed robbery committed by Petitioner's co-defendant boyfriend, Joseph Villani.  *See State v. Garajau*, No. A-2807-18, 2021 WL 1750140, at *1 (N.J. Super. Ct. App. Div. May 4, 2021) (per curiam) (footnotes omitted) (citing *State v. Reyes*, 50 N.J. 454 (1967)).  "The State had alleged that defendant and her boyfriend conspired to rob and murder the victim, someone they had known, then dispose of the body." *Id.*  A jury found Petitioner guilty of second-degree conspiracy to commit robbery (Count Three), first-degree robbery (Count Four), first-degree felony murder (Count Five), third-degree conspiracy to commit theft of marijuana (Count Six), third-degree theft of marijuana (Count Seven), third-degree conspiracy to commit theft of cash and/or a Movado watch (Count Eight as to theft and theft of cash), third-degree theft of cash and/or a Movado watch (Cout Nine as to theft and theft of cash), second-degree conspiracy to possess a weapon for an unlawful purpose (Count Ten), second-degree possession of a weapon for an unlawful purpose (Count Eleven), third-degree conspiracy to distribute marijuana (Count Fourteen), fourth-degree tampering with physical evidence (Counts Sixteen, Seventeen, and Eighteen), third-degree hindering the apprehension of oneself (Count Nineteen), third-degree hindering the apprehension of another (Count Twenty-One), and third-degree tampering with a witness or informant (Count Twenty-Two).  *Id.* at *1 n.1.

The following summary recounts the trial evidence concerning Petitioner's role in the events leading to the robbery and Patel's fatal shooting and in the subsequent efforts to cover up the crimes.

Petitioner and Villani started dating around the summer of 2016.  (ECF 1-2, Aug. 8, 2018 Tr. Vol. I ("Aug. 8. 2018 Tr. Vol. I") at T84:8-18 (A_1556).)  Patel was a marijuana dealer, who was known to carry cash.  (ECF No. 1-2, Jul. 24, 2018 Tr. ("Jul. 24, 2018 Tr.") at T94:8-20 (A_0200).)  Petitioner and Villani also both sold marijuana, and the couple often sold marijuana together.  (ECF No. 1-2, Jul. 25, 2018 Tr. ("Jul. 25, 2018 Tr.") at T13:19-14:11, T:16:12-25 (A_0228-29, A_0231); Jul. 26, 2018 Tr. ("Jul. 26, 2018 Tr.") at T10:13-12:3 (A_0359-61).) Petitioner's best friend (Niko Kacandes) described Petitioner's relationship with Villani as "toxic" because Petitioner was "very controlling," and, in early 2017, the couple communicated with each other between thirty to two hundred times a day.  (Jul. 25, 2018 Tr. at T10:25-11:11, T12:2-16 (A_0226-27); ECF No. 1-2, Aug. 9, 2017 Tr. ("Aug. 9, 2017 Tr.") at 185:20-187:23 (A_1892-94).)

On January 12, 2017, Villani and his friend Eric Geller met up with Patel at a tavern.  (Aug. 8, 2018 Tr. Vol. I at T96:21-97:8 (A_1568-69).)  Petitioner also went to the tavern separately with her friend Thaisa Borges, and Petitioner and Borges discussed Petitioner following Patel after Patel left the tavern.  (*Id*. at T113:2-13 (A_1585).)  During the meeting, Petitioner and her friend sat nearby but did not approach or interact with Villani and Patel.  (*Id.* at T98:1-24, T107:1–24 (A_1570, A_1579).)  After dinner, Petitioner and her friend sat in her car for forty minutes, and Petitioner texted Villani, "[W]hat is the next step[?] Should we follow[?]"  (Aug. 16, 2018 Tr. at T85:24–86:15 (A_2340–41).)  Villani responded, "I'm getting a QP" (quarter pound of marijuana)

and "I made the connection." (Aug. 15, 2018 Tr. at T13:22-14:5 (A_2093-94).) Petitioner did not follow Patel after he left the tavern. (Aug. 8, 2018 Tr. Vol. I at T113:9-10 (A_1585).)

On January 19, 2017, Villani texted Petitioner, "Rifle works" and "Got the bullets too." *(*Aug. 15, 2018 Tr. at T43:17-19 (A_2123).) Petitioner responded, "What?" "Why are you fucking with it?" "Where did you shoot it?" (*Id*. at T43:20-22 (A_2123).) Villani replied, "Just to understand it." "Didn't shoot it." "I cleaned it." "Watched YouTube." (*Id*. at T43:22-25 (A_2123).) Petitioner then texted: "Baby please don't." "What made you get up and clean a gun?" (*Id.* at T43:25-44:3 (A_2123-24).) The next day (January 20, 2017) Villani texted Petitioner about purchasing more marijuana from Patel, which he did that afternoon. (Aug. 15, 2018 Tr. at T45:1-47:25 (A_2125-27).

On February 2, 2017, Petitioner texted Villani, "You need to clean the bullets," and Villani responded, "No shit." (*Id*. at T52:8-53:12 (A_2132-33).)

On February 3, 2017, Petitioner texted Villani, "I didn't get paid for a full week and have no gas" and "I'm just stressed – the hell out RN about money." (*Id.* at T56:22-57:1 (A_2135-36).)

On February 5, 2017, Petitioner and Villani had a conversation with Kacandes, who wanted to buy marijuana. (Jul. 25, 2018 Tr. at T18:3-19 (A_0233).) Petitioner told Kacandes that he should refrain from buying any marijuana that night because Villani was planning on robbing someone the next day. (*Id.*) Villani joined the conversation and said he had bought from this "plug" (Patel) before, planned to bring Patel into the garage, and then shut the door so Patel could not leave. (*Id*. at T23:8-18 (A_0238).) On cross-examination, Kacandes testified that Villani said that "he [Villani] was going to beat him [Patel] up and hit [Patel] so hard that [Villani] wouldn't have to worry about the man retaliating." (*Id.* at T73:21-74:10 (A_0288-89).)

On February 6, 2017, at 12:31 p.m. Petitioner texted Villani: "What's Troop saying?" (Aug. 15, 2018 Tr. at T62:3-19 (A_2142).) Petitioner and Villani were in contact throughout the day, and, at approximately 2:00 p.m., their phones were both in the cell coverage area that included Villani's house. (ECF 1-2, Aug. 14, 2018 Tr. ("Aug. 14, 2018 Tr.") at T80:4-25, T86:16-87:16 (A_1983, A_1989-90).) Petitioner texted Villani that she wanted to break up, and he responded by telling her to leave. (Aug. 15, 2018 Tr. at T66:17-23 (A_2146).) The couple's "break-ups" typically lasted about an hour. (Jul. 25, 2018 Tr. at 44:8-45:8 (A_0259-60).) In this instance, fifteen minutes later, Petitioner texted that she would come back after class. (Aug. 15, 2018 Tr. at T66:17-23 (A_2146).) Petitioner missed her 2:00 p.m. class at Brookdale Community College and was back in Villani's cell coverage area by 2:23 p.m. (Aug. 8, 2018 Tr. Vol. I at T155:2-12 (A_1627); Aug. 14, 2018 Tr. at T88:1-20 (A_1991).) At 2:29 p.m., Petitioner texted her sister and lied by telling the sister she was in class. (Aug. 15, 2018 Tr. at 67:22-69:2 (A_2147-49).)

At 3:33 p.m., Patel's phone was within Villani's cell coverage area. (ECF 1-2, Aug. 9, 2018 Tr. ("Aug. 9, 2018 Tr.") at T158:10-63:2 (A_1865-70).) Around the same time, a neighbor heard three gunshots. (Jul. 25, 2018 Tr. at T120:18-122:4 (A_0335-37).) Patel did not return home that day. (Jul. 24, 2018 Tr. at T75:13-23 (A_0181).)

In the evening, Villani told Kacandes that he had robbed Patel and hit the victim so hard "he [Patel] would not retaliate." (Jul. 25, 2018 Tr. at T30:13-23 (A_0245).) Petitioner, who was present during their conversation, added, "You should have heard how hard [Patel] hit the ground." (*Id.* at T30:8-24 (A_0245); *see also id.* at T93:19-94:1 (A_0308-09).) Petitioner and Villani described taking a pound of marijuana and $2,000 from Patel's car. (*Id.* at T30:18-31:3, T32:3-11 (A_0245-46, A_0247A).)

5

Throughout the evening, Petitioner texted Villani, including texting him at 5:02 p.m. the word "Bleach." (Aug. 15, 2018 Tr. at T104:8-20 (A_2184).) Petitioner also instructed Villani, "Take your time bleaching everything," and "Take that bag of stuff out 'cause I touched his phone. We will throw that stuff in the Ocean." (Aug. 15, 2018 Tr. at T104:14-05:6 (A_2184-85).) Villani later showed Brandon Wobser Patel's body in his garage, wrapped in a blue blanket. (ECF No. 1-2, Aug. 1, 2018 Tr. ("Aug. 1, 2018 Tr.") at T106:1-09:15 (A_0899-0902).) Before disposing of the body, Wobser poured bleach while Villani cleaned blood from the garage floor. (*Id*. at T117:23-18:7 (A_0910-11).) Villani and Wobser eventually disposed of Patel's body in Shark River Park. (Aug. 1, 2018 Tr. at 128:15-130:6, 149:2-12 (A_0921-23, A_0942).)

In the early morning of February 7, 2017, Petitioner told Villani to "wipe down the car" and asked him to call her when he was done, which he did. (Aug. 15, 2018 Tr. at T89:14-18. T106:11-21 (A_2186, A_2169).) Petitioner and Villani exchanged additional texts, including one where Petitioner warned Villani about increased police presence near his home, texting, "They're gonna be around your neighborhood a lot." (*Id*. at T110:22-111:11, T137:5-25 (A_2190-2191, A_2217).) At 3:31 p.m., Petitioner urged him to move Patel's Jaguar: "Babe you need to move that car. It's too important." "Like ASAP." "People will start noticing he's not answering." (*Id*. at T112:12-21 (A_2192).) Petitioner continued texting Villani in the afternoon, demanding he leave work to deal with the car. (*Id*. at T112:23-15:10 (A_2192-95).)

At 12:00 a.m. on February 8, 2017, a YouTube search for "[h]ow to drive a stick shift" was made on Petitioner's phone and later deleted. (*Id*. at T117:6-22 (A_2197).) Petitioner then texted Villani, "Take everything you touch out," and later warned, "If that car isn't moved by 11:30 we're done." (*Id*. at T117:1-5, T121:2-3 (A_2197, A_2201).) On that same day, Petitioner and Villani coordinated with Tyler Yuhas to move Patel's Jaguar. (*Id*. at T126:1-28:5 (A_2206-08).) Later

6

that afternoon, Villani texted Petitioner, "Dad needs the bleach," and she replied, "Just buy a new one." (*Id*. at T127:22-28:1 (A_2207-08).)

After the robbery, Petitioner had in her possession a new pair of Louboutin shoes and a gold Pandora ring Villani had purchased for her. (Jul. 25, 2018 Tr. at T41:1-19 (A_0256).) On February 21, 2017, Petitioner's employer received an anonymous email stating, "To get away with murder the best cause is with a smile." (Sept. 4, 2018 Tr. at T61:3-62:3, T64:19-69:25 (A_2497-98, A_2500-05).) Thirteen minutes later, Petitioner texted Villani, "The best way to get away with murder is with a smile." (Aug. 15, 2018 Tr. at T151:10-24 (A_2231).) On February 22, 2017, after news reports confirmed that Patel's body had been found in Shark River Park, Petitioner took a screenshot of a newspaper article and sent it to Villani, telling him to clean his car and saying she was going to faint. (*Id*. at T155:7-58:21 (A_2235-38).)

Following a twenty-four-day trial, the state trial court sentenced Petitioner to an aggregate term of thirty-three years imprisonment, including thirty years of parole ineligibility for felony murder, and a consecutive three-year sentence for witness tampering, with concurrent terms of either eighteen months or three years on the remaining convictions. *See Garajau*, 2021 WL 1750140, at *1 n.4. Petitioner appealed on several grounds, including the claim that the trial court erred in denying her motions for judgment of acquittal and for judgment notwithstanding the verdict on the basis that the evidence was insufficient to support her convictions. *See id.* The Appellate Division rejected that argument on the merits and affirmed the judgment of conviction. *See id.* at *2-24.

Petitioner then filed a petition for certification to the New Jersey Supreme Court, but she did not include the sufficiency of the evidence argument among the issues presented. (*See* ECF

No. 6-6 at 1-26.)    On November 1, 2021, the New Jersey Supreme Court denied certification.  *See State v. Garajau*, 248 N.J. 591 (2021).

Petitioner filed her timely Petition and a supporting brief on August 24, 2022, raising one claim of relief: "The New Jersey state courts' rejection of [Petitioner's] insufficient evidence challenges to the Weapon Convictions is objectively unreasonable under clearly established federal law." (ECF No. 1 at 5; ECF No. 1-1.)  In their response to the Petition, Respondents argued that Petitioner failed to exhaust this claim because she did not raise it before the New Jersey Supreme Court.  (*See* ECF No. 6 at 4.)  Petitioner sought a stay, which the Court denied without prejudice.  (*See* ECF Nos. 7, 9.)  After renewing her stay request, which Respondents did not oppose, the Court granted it and ordered Petitioner to seek exhaustion before the New Jersey Supreme Court.  (*See* ECF Nos. 10–12.)  On March 24, 2023, the New Jersey Supreme Court granted her motions for leave to file a motion for reconsideration as within time and for leave to file a supplemental petition for certification, but denied reconsideration and certification.  *See State v. Garajau*, 263 N.J. 397 (2023).  Petitioner then filed a motion to reopen this case, which the Court granted.  (*See* ECF Nos. 14-15.)

Respondents contend that the Court should reject Petitioner's (now exhausted) evidentiary insufficiency claim because it was not objectively unreasonable under clearly established federal law for the Appellate Division to decide that a rational jury could have found Petitioner guilty beyond a reasonable doubt of conspiracy to commit robbery, armed robbery, felony murder, conspiracy to possess a firearm for an unlawful purpose, and possession of a firearm for an unlawful purpose.  (*See* ECF Nos. 6, 16.)  Petitioner filed a reply in further support of her claim.  (*See* ECF No. 17.)

## II.    <u>LEGAL STANDARD</u>

A federal court may grant a writ of habeas corpus only for violations of the Constitution, laws, or treaties of the United States.  *See Engle v. Isaac*, 456 U.S. 107, 119 (1982); *see also Mason v. Myers*, 208 F.3d 414, 415 n.1 (3d Cir. 2000) (citing 28 U.S.C. § 2254).  Petitioner filed the Petition after April 24, 1996, so the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies.  *See Lindh v. Murphy*, 521 U.S. 320, 326 (1997).

Under AEDPA, federal courts may not grant habeas relief on claims that a state court has adjudicated on the merits unless the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court, or was based on an unreasonable determination of the facts in light of the evidence presented.  *See* 28 U.S.C. § 2254(d).  This standard is "highly deferential" and "difficult to meet," requiring federal courts to give state-court decisions the benefit of the doubt.  *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Harrington v., Richter*, 562 U.S. 86, 102 (2011); *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)).  The Supreme Court has emphasized that § 2254(d) bars relief so long as "'fair-minded jurists could disagree' on the correctness of the state court's decision."  *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).  Under this statutory provision, habeas relief is precluded unless the state court's decision was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement."  *Id.* at 103.

Clearly established federal law under § 2254(d)(1) refers to the governing legal principle set forth by the Supreme Court at the time the state court rendered its decision.  *See Lockyer v. Andrade*, 538 U.S. 63, 71 (2003).  A federal court reviewing for unreasonable application must ask    whether    the    state    court's    application    of    federal    law    was    objectively

9

unreasonable. *See Williams v. Taylor*, 529 U.S. 362, 409 (2000). It may not grant relief merely because it believes the state court applied federal law incorrectly; the application must also be unreasonable. *See Id.* at 411.

The law presumes the state court's factual findings are correct, and a Petitioner may rebut them only by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *see also Rice v. Collins*, 546 U.S. 333, 338-39 (2006); *Duncan v. Morton*, 256 F.3d 189, 196 (3d Cir. 2001). Review under § 2254(d)(1) is limited to the record before the state court that adjudicated the claim on the merits. *See Pinholster*, 563 U.S. at 181.

When reviewing a habeas petition under AEDPA, the relevant decision for the federal court is the last reasoned opinion issued by the state courts. *See Bond v. Beard*, 539 F.3d 256, 289–90 (3d Cir. 2008). When a state court issues a reasoned decision rejecting a federal claim, courts presume that any subsequent unexplained affirmances rest on the same grounds. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991). This presumption remains valid under AEDPA and has been reaffirmed by the Supreme Court. *See Wilson v. Sellers*, 584 U.S. 122, 125 (2018). The Third Circuit has likewise recognized its continued applicability. *See Rambo v. Adm'r East Jersey State Prison*, 762 F. App'x 105, 107 (3d Cir. 2019).

## III.    DISCUSSION

### A.    Petitioner's Sole Claim for Habeas Relief

#### 1.    The *Jackson* Standard and the Appellate Division's Opinion

In her only claim for habeas relief, Petitioner asserts that "[t]he New Jersey state courts' rejection of [her] insufficient evidence challenges to the Weapon Convictions is objectively

unreasonable under clearly established federal law."[1]  (ECF No. 1 at 5; ECF No. 1-1.)  The challenged "Weapon Convictions" consist of the following five charges: (second-degree conspiracy to commit robbery (Count Three) first-degree robbery (Count Four), first-degree felony murder (Count Five), second-degree conspiracy to possess a weapon for an unlawful purpose (Count Ten), and second-degree possession of a weapon for an unlawful purpose (Count Eleven). (*See* ECF No. 1 at 5.))

The parties agree that "[t]he clearly established federal law" was established in *Jackson v. Virginia*, 443 U.S. 207 (1979).  Under *Jackson*, a conviction comports with due process if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  443 U.S. at 319 (citation omitted); *see also Eley v. Erickson*, 712 F.3d 837, 847 (3d Cir. 2013) ("The clearly established federal law governing Eley's [insufficient evidence] claim was determined in *Jackson*.").  The requirement of proof beyond a reasonable doubt "impress[es] upon the factfinder the need to reach a subjective state of near certitude of the guilt of the accused."  *Jackson*, 443 U.S. at 315 (citation omitted); *see also id.* at 320 (indicating that a "mere modicum of evidence" is insufficient to support a conviction).

It also undisputed that AEDPA imposes a second layer of deference on claims of insufficient evidence under *Jackson* because the Appellate Division considered and rejected Petitioner's *Jackson* claim on the merits.  "[O]n habeas review, 'a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court.  The federal court instead may do so only if the state court

---

[1]    Petitioner does not claim that the Appellate Division's decision was contrary to clearly established federal law as determined by the United States Supreme Court.

decision was 'objectively unreasonable.'" *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (per

curiam) (quoting *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam)).

The Appellate Division decided that there was sufficient evidence to support the

convictions for "conspiracy to commit armed robbery and robbery" and "felony murder":

> As to the robbery counts, the State provided proofs which
> included: (1) testimony from Kacandes about conversations that
> occurred on February 5, 2017 with defendant and Villani about a
> plan to rob an individual; (2) multiple text messages that were sent
> between defendant and Villani regarding a rifle, and, specifically, a
> text sent by defendant to Villani, which said "[y]ou need to clean the
> bullets;" (3) attendance records, which showed that defendant did
> not attend class on February 6, 2017; (4) cell phone records, which
> showed that defendant was in the area of Villani's home around the
> time of the robbery and murder; (5) testimony from multiple
> witnesses regarding the amount of marijuana Villani had in his
> possession after February 6, 2017, and the amount of cash he had
> available after that date; and (6) testimony from the medical
> examiner and Brandon Wobser that the victim was shot three
> times—once in the chest and twice in the head. Based on this
> evidence, a reasonable jury could find defendant guilty of
> conspiracy to commit armed robbery and robbery. These same
> proofs also supported the felony murder count.

*Garajau*, 2021 WL 1750140, at *6.

The Appellate Division also addressed the weapon possession charges:

> As to the weapon possession counts, once again, the State's
> proofs included text messages between defendant and Villani
> regarding a rifle. Of significance was a text sent by defendant to
> Villani that said, "[y]ou need to clean the bullets." Additionally, the
> State's proofs included: (1) the murder weapon, a .22 Long Rifle
> Caliber Marlin Semi-Automatic Rifle, which was found in Villani's
> home; (2) bullet casings, which were found in Villani's garage and
> bedroom; and (3) YouTube videos found on Villani's computer that
> were accessed two weeks prior to the victim's murder regarding
> loading, cleaning, and shooting the rifle. A reasonable jury could
> find defendant guilty of possession of a weapon for an unlawful
> purpose.

*Id.*

The Appellate Division further rejected Petitioner's contention that, "as for the conspiracy counts . . . [t]here is no direct evidence of defendant's participation in a conspiracy to commit armed robbery or acting as an accomplice to felony murder or the weapons charges":

> As for the conspiracy counts, defendant contends that "[t]here is no direct evidence of defendant's participation in a conspiracy to commit armed robbery or acting as an accomplice to felony murder or the weapons charges." Defendant maintains that "[t]he entirety of the State's case rests on the inferences to be drawn from the facts presented." As explained above, however, the State need not present only direct evidence. [State v. Reyes, 50 N.J. 454, 459, 236 A.2d 385 (1967)]. The evidence may be circumstantial, and the jury is permitted to draw inferences from that evidence. [State v. Williams, 218 N.J. 576, 594, 95 A.3d 721 (2014)]. As discussed above, the State presented multiple pieces of evidence suggesting that defendant and Villani had entered a conspiracy to rob the victim of marijuana and cash, and thus, the judge correctly denied defendant's motion for a judgment of acquittal on those counts.
>
> Defendant further argues that there was no direct evidence that she acted as Villani's accomplice. However, once again, direct evidence is not required. Reyes, 50 N.J. at 459, 236 A.2d 385. The State presented multiple pieces of evidence suggesting that defendant did act as Villani's accomplice, and therefore, the judge correctly denied defendant's motion for a judgment of acquittal on those counts as well.

*Id.* at *7.

### 2.    The Substantive Elements of Petitioner's "Weapon Convictions"

"Under *Jackson*, federal courts must look to state law for 'the substantive elements of the criminal offense, but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law.'" *Coleman*, 566 U.S. at 655 (quoting *Jackson*, 433 U.S. at 324 n.16)); *see also Chiarella v. United States*, 445 U.S. 222, 236-37 (1980) (indicating that a conviction violates due process if it rests on a legal or factual theory that was never presented to the jury).

In its jury instructions, the state trial court explained that, in Count Three, the prosecution charged Petitioner with the crime of conspiracy with Villani to commit the armed robbery of Patel. (ECF No. 1-2, Sept. 6, 2018 Tr. ("Sept. 6, 2018 Tr.") at T31:14-18, 32:2-10 (A_2715-16).)  To convict Petitioner of conspiracy, the prosecution had to prove beyond a reasonable doubt that Petitioner, "with the purpose of promoting or facilitating" the commission of a crime either "(1) [a]grees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime" or "(2) [a]grees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime."  N.J. Stat. Ann. § 2C:5-2(a).  "A person acts purposely with respect to the nature of her conduct or a result thereof, if it is her conscious object to engage in conduct of that nature or cause such a result," and she acts purposely with respect to attendant circumstances "if she is aware of the existence of such circumstances or she believes or hopes that they exist."  (Sept. 6, 2018 Tr. at T32:20:-33:1 (A_2716-17).)  According to the trial court: "In order to find a defendant guilty of the crime of conspiracy, the state does not have to prove that she actually committed armed robbery.  However, to decide whether the state has proven the crime of conspiracy you must understand what constitutes the crime of armed robbery" (*Id.* at T:33:2-7 (A_2717).)

A person commits robbery if, in the course of committing a theft, he or she inflicts bodily injury or uses force upon another.  N.J. Stat. Ann. § 2C:15-1(a)(1).  "Robbery is a crime of the second degree, except that it is a crime of the first degree if in the course of committing the theft the actor attempts to kill anyone, or purposely inflicts or attempts to inflict serious bodily injury, or is armed with, or uses or threatens the immediate use of a deadly weapon."  *Id.* § 2C:15-1(b). The trial court explained to the jury that, "[i]n this case, the state must prove, beyond a reasonable

doubt, that a person was armed with, used or threatened the immediate use of a deadly weapon [*i.e.*, a firearm] while in the course of committing the robbery," and, to be "armed with a firearm the state must prove, beyond a reasonable doubt, that they were in possession of it." (Sept. 6, 2018 Tr. at T37:12-14, T38:4-6 (A_2718-19).)

To prove possession:

> [T]the State must show "intentional control and dominion, the ability to affect physically and care for the item during a span of time, accompanied by knowledge of its character." "Possession does not necessarily mean actual physical possession; it is enough that defendant have 'intentional control and dominion' over the object." Thus the law recognizes that possession may be constructive as well as actual. If two or more persons share actual or constructive possession of a thing, possession is joint, that is, if they knowingly share control over the article. Thus possession need not be exclusive but may be jointly exercised by two or more persons. Proof of possession may be by circumstantial evidence as well as direct evidence.

*State v. Latimore*, 197 N.J. Super. 197, 210 (App. Div. 1984) (citations omitted), *overruled on other grounds by State v. Camacho*, 153 N.J. 54 (1998).[2]

---

[2]    According to the trial court:

> In order for a person to be armed with a firearm the state must prove, beyond a reasonable doubt, that they were in possession of it. The word "possess" means a knowing, intentional control of a designated thing, accompanied by a knowledge of its character. I've already defined the term knowingly for you. Thus the person must know or be aware that they possess the item and must know that what it is that they possess or control.
>
> This possession cannot nearly be a passing control that is fleeting or uncertain in nature. In other words, "to possess" within the meaning of the law a person must knowingly procure or receive the item possessed, or be aware of their control thereof for a sufficient period of time to have been able to relinquish control if they choose to do so.

Furthermore, "the state must prove, beyond a reasonable doubt not only possession, but also immediate access to that deadly weapon," *i.e.*, that "the firearm was easily accessible and readily available for use during the robbery." (Sept. 6, 2018 Tr. at T39:16-22 (A_2720).) "Finally, in order for you [the jury] to find that a person was armed with a deadly weapon, the state must prove beyond a reasonable doubt not only that they possessed and had immediate access to the potential weapon, but also had the purpose to use it in a way that is capable of producing death or serious bodily injury." (*Id.* at T39:23-40:4 (A_2720).)

Conspiracy may be proven by either direct or circumstantial evidence, but mere association or acquittance, a family relationship, or meetings or discussions of "names and interests in common" with an alleged co-conspirator, or an awareness of the conspiracy, is not sufficient (however, such circumstances, may be taken into consideration with other relevant evidence in the

---

When we speak of "possession," we mean conscious knowing possession. The law recognizes two kinds of possession. They are actual possession and constructive possession. A person is in actual possession of a particular article or thing when they have knowledge of its character, and knowingly have it on their person at a given time. A person who had knowledge of its character knowingly has direct physical control over a thing at a given time is in actual possession of it.

"Constructive possession" means a possession in which the person does not physically have the property but though not physically on one's person they are aware of the presence of the property and are able to and has the intention to exercise control over it.

A person who although not in actual possession has knowledge of its character knowingly both has the power and intention at a given time to exercise control over a thing, either directly or through another person or person is then in constructive possession of it.

(Sept. 6. 2018 Tr. at T38:4-39:15 (A_2719-20).)

jury's deliberations).  (*Id.* at T40:7-23 (A_2720).)  The jury had to decide whether Petitioner's "purpose" was that either "she or a person with whom she was conspiring would commit the crime of armed robbery."  (*Id.* at T40:24-41:1 (A_2720-21).)  "For her [Petitioner] to be found guilty of conspiracy, the state has to prove beyond a reasonable doubt, that when she agreed it was her conscious object or purpose to promote or make it easier to commit the crime of armed robbery."  (*Id.* at T41:1-5 (A_2721).)  The nature of the purpose was a question of fact for the jury to decide by inference from conduct, words, or acts, and it was not necessary for the prosecution to produce a witness or witnesses who could testify that the defendant stated, for example, that she acted with a specific purpose.  (*Id.* at T41:6-17 (A_2721).)

"As to count four [first-degree robbery], the judge correctly charged the jury with the model jury charge on accomplice liability as well as co-conspirator liability."  *Garajau*, 2021 WL 1750140, at *8.

Under N.J. Stat. Ann. § 2C:2-6(c)(1)(b), the jury could convict Petitioner on Count Four as an accomplice if it was proven that Petitioner, "[w]ith the purpose of promoting or facilitating the commission of the offense," "[a]ids or agrees or attempts to aid such other person in planning or committing it."  The trial court instructed the jury that, to find Petitioner guilty on Count Four under an accomplice theory of liability, it must find beyond a reasonable doubt that Villani committed the crime of robbery,[3] she did aid or agree or attempt to aid him in planning or committing the robbery, her purpose was to promote or facilitate the commission of the offense of robbery, and she possessed the criminal state of mind required to be proved against the person who actually committed the criminal act of robbery.  (Sept. 6, 2018 Tr. at T51:12-23 (A_2726).)  "Aid"

---

[3]    The trial court again instructed the jury on the elements of robbery and armed robbery.  (Sept. 6, 2018 Tr. at T43:14-50:1 (A_2722-25).)

17

means to assist, support, or supplement the efforts of another, "agreed to aid" means to encourage by a promise or assistance or support, and "attempt to aid" means that a person takes a substantial step in the course of conduct designed to or planned to lend support or assistance in the efforts of another to cause the commission of another substantive offense. (*Id.* at T52:3-11 (A_2726).) To prove that Petitioner was an accomplice, the prosecution did not have to prove "a verbal agreement" or provide direct evidence of a "formal plan" to commit a crime; instead "proof may be circumstantial," and participation in an agreement may be shown with conduct or spoken words. (*Id.* at T52:20-53:1 (A_2726-27).) While mere presence at the scene was not conclusive evidence of participation; the jury could infer from presence at the scene in connection with other evidence that the defendant assented to, and aided, in the commission of the crime. (*Id.* at T53:1-22 (A_2727).) "To constitute guilt there must be existence of a community of purpose, an actual participation in the crime committed." (*Id.* at T53:10-12 (A_2727).)

According to the trial court:

> Remember that this defendant can be held to be an accomplice with equal responsibility only if you find, as a fact that she possessed the criminal state of mind that is required to be proved against the person as she committed the criminal act.

> In order to convict the defendant as an accomplice to the specific crime charged, you must find the defendant had the purpose to participate in that particular crime. She must act with the purpose of promoting or facilitating the commission of the substantive crime with which she is charged.

> A defendant cannot be convicted as an accomplice to robbery based solely on conduct occurring after the principal's commission of the theft. Specifically, defendant must have the purpose that in the course of committing a theft, bodily injury or force be inflicted upon Trupal Patel and Joseph Villani be armed with use or threaten the immediate use of a deadly weapon. It is not sufficient to prove only that the defendant had knowledge that Joseph Villani was going to commit robbery. The state must prove

> that it was the defendant's conscious object that robbery be
> committed.

(*Id.* at T54:5-55:2 (A_2727-28).) "An accomplice is only guilty of the <u>same</u> crime committed by the principal if he shares the <u>same</u> criminal state of mind as the principal." *State v. Ramirez*, 246 N.J. 61, 67 (2021) (emphasis in original) (quoting *State v. Whittaker*, 200 N.J. 444, 458 (2009)). "[A]n accomplice who does not have a shared purpose 'to a commit a robbery <u>with a weapon</u> is guilty of robbery – not armed robbery.'" *Id.* at 67-68 (emphasis in original) (quoting *Whittaker*, 200 N.J. at 459). In other words, for Petitioner to be found guilty of *armed* robbery under an accomplice theory of criminal liability, the prosecution had to prove beyond a reasonable doubt that she shared the purpose of committing a robbery with a weapon.

Furthermore, the trial court instructed the jury that "if you are satisfied beyond a reasonable doubt . . . that Joseph Villani committed the crime of robbery, then you must go on to determine the guilt or innocence of Defendant as a co-conspirator for that same crime." (Sept. 6, 2018 Tr. at T56:22-57:2 (A_2728-29).) To find that Petitioner engaged in a conspiracy with Villani, the jury had to be satisfied beyond a reasonable doubt that:

> 1.    The defendant agreed with Joseph Villani that they or one or more of them will engage in conduct, which constitutes armed robbery or an attempt to solicitation to commit armed robbery.
>
> 2.    That when the defendant so agreed with Joseph Villani the defendant's purpose, i.e., her conscious object was to promote or make it easier for Joseph Villani to commit the crime of armed robbery.

(*Id.* at T57:23-58:5 (A_2729).)

Felony murder (Count Five) "is committed when the actor, acting either alone or with one or more other persons, is engaged in the commission of, or an attempt to commit, or flight after committing or attempting to commit robbery" and, "in the course of such crime or of immediate

flight therefrom, any person causes the death of a person other than one of the participants." N.J. Stat. Ann. § 2C:11-3(a)(3). According to the jury charge, the jury could not find Petitioner guilty of felony murder unless it found her guilty of committing the crime of robbery charged in Count Four. (Sept. 6, 2018 Tr. at T62:4-7 (A_2731).)

In Counts Ten and Eleven, Petitioner was charged with second-degree conspiracy to possess a weapon for an unlawful purpose and second-degree possession of a weapon for an unlawful purpose, respectively. *See Garajau*, 2021 WL 1750140, at *1 n.1. A person is guilty of possession of a weapon for an unlawful purpose if he "has in his possession any firearm with a purpose to use it unlawfully against the person or property of another." N.J. Stat. Ann. § 2C:39-4(a)(1).

The trial court instructed the jury that, in order to find Petitioner guilty of the crime of conspiracy, the prosecution must prove beyond a reasonable doubt that Petitioner agreed with Villani that they or one or more of them would engage in conduct which constitutes the crime of possession of a weapon for an unlawful purpose, or an attempt or solicitation to commit possession of a weapon for an unlawful purpose; and that the defendant's purpose was to promote or facilitate the commission of the crime of possession of a weapon for an unlawful purpose. (Sept. 6, 2018 Tr. at T107:10-20 (A_2754).) The trial court reiterated its explanation from Count Four of such terms as "purposely" and the fact that a conspiracy may be proven by either direct or circumstantial evidence. (*Id.* at T1107:21-10:7 (A_2754-55).)

Like the robbery charge in Count Four, the prosecution alleged under Count Eleven (second-degree possession of a weapon for an unlawful purpose) that Petitioner was legally responsible for the criminal conduct of Villani as an accomplice and/or a co-conspirator, and

accordingly, the trial judge instructed the jury on the theories of accomplice and co-conspirator

liability. (Sept. 6, 2018 Tr. at T110:24-28:14 (A_2755-64).)

Specifically, the trial court instructed the jury that, in order to find Petitioner guilty on

Count Eleven as an accomplice, the jury must find:

> 1.     That Joseph Villani committed the crime of possession of a weapon for an unlawful purpose. I've already explained the elements of this offense for you.
>
> 2.     That this defen[dant] did aid or agree, or attempt to aid him in the planning or committing it.
>
> 3.     That this defendant's purpose was to promote or facilitate the commission of the offense of possession of a weapon for an unlawful purpose. And –
>
> 4.     That this defendant possessed the criminal state of mind that is required to be proved against the person who actually committed the act of possession of the weapon for the unlawful purpose.

(Sept. 6, 2018 Tr. at T119:19-20:6 (A_2760); *see also id.* at T120:7-22:22 (explaining principles

of accomplice liability such as potential significance of "presence").) In order for the jury to find

Villani committed the offense of possession of a weapon for an unlawful purpose, the prosecution

had to show that the rifle is a firearm, he possessed the firearm, he possessed the firearm with the

purpose to use it against the person or property of another, and his purpose was to use the firearm

unlawfully. (*Id.* at T112:4-16 (A_2756); *see also id.* at T113:12-17:3 (A_2757-59) (charging the

jury that the prosecution must prove that Villani knowingly (constructively or actually) possessed

the weapon with a purpose to use it against the person or property of another).) The trial court

explained that: "It is not sufficient to prove only that the defendant had knowledge that Joseph

Villani was going to use a firearm unlawfully against a person or property of Trupal Patel. The

state must prove that it was the defendant's conscious object that a firearm be used unlawfully against a person or property of Trupal Patel. (*Id.* at T122:16-22 (A_2761).)

The prosecution also alleged that Petitioner was legally responsible for the conduct of Villani as a co-conspirator. (*Id.* at T123:14-21 (A_2762).) "If you are satisfied beyond a reasonable doubt that the state has proven all of these essential elements that Joseph Villani committed the crime of possession of a weapon for an unlawful purpose then you must go on to determine the guilt or innocence of the defendant as a co-conspirator for that same offense." (*Id.* at T124:15-20 (A_2762).) According to the trial court:

> Our law provides that a person is guilty of an offense if it is committed by her own conduct or by the conduct of another person for which she is legally accountable or both. A person is legally accountable for the conduct of another person when she is engaged in a conspiracy with such other person and the conduct is within the scope of the conspiracy. Thus, she [sic] must decide whether the defendant engaged in the conspiracy with Joseph Villani to commit the crime of possession of a weapon for an unlawful purpose
>
> A person is guilty of a conspiracy with another [person] if with the purpose of promoting or facilitating the commission of a crime she agrees with such other person or persons that they or one or more of them would engage in conduct which constitutes such crime or attempt or solicitation to commit such crime. Thus, for the purposes of this case to find the defendant engaged in the conspiracy with Joseph Villani you must be satisfied, beyond a reasonable doubt, of the following elements:
>
> 1. That they or one or more of them would engage in conduct which constitutes possession of a weapon for an unlawful purpose or an attempt or solicitation to commit possession of a weapon for an unlawful purpose.
>
> 2. When the defendant so agreed with Joseph Villani, the defendant's purpose, i.e. her conscious object was to promote or to make easier for Joseph Villani to commit the crime of possession of a weapon for an unlawful purpose.

(*Id.* at T125:6-26:10 (A-2763).)

### 3.    The Sufficiency of the Evidence under *Jackson* and the Objective Reasonableness of the Appellate Division's Decision

It is undisputed that, for purposes of Petitioner's claim for relief, Villani committed armed robbery and felony murder and possessed a weapon for an unlawful purpose.  According to Petitioner, "[e]ach of the Weapon Convictions required the State to prove beyond a reasonable doubt that [Petitioner] knew – before Villani robbed and killed Patel -- that he intended to use his father's rifle during the robbery and that she conspired with him to commit or purposely aided him in committing, that armed robbery."  (ECF No. 1-1 at 31.)  However, the Court initially concludes that Petitioner's detailed parsing of the evidence is inconsistent with the deference this Court owes to the jury's fact-finding under the *Jackson* standard and the state court's ruling under AEDPA.

Petitioner argues at some length that the New Jersey courts unreasonably rejected her sufficiency challenge to the Weapon Convictions because the evidence suggested, at most, that she knew that her then-boyfriend, Villani, planned to rob Patel and beat him up but that "[n]o evidence suggested that she knew [Villani] intended to use a weapon during that robbery, much less that she conspired with him to do so or purposely aided his doing so."  (ECF No. 1-1 at 1.)

Petitioner notes that the Appellate Division relied on the two pre-robbery text exchanges regarding the rifle and "bullets" between Petitioner and Villani.  (ECF No. 1-1 at 4.)  Petitioner contends that nether text exchange suggested that she had any idea that Villani would arm himself with the rifle during his solo robbery of Patel; the text messages did not mention or have anything to do with the future robbery, much less that Petitioner shared Villani's later-formed decision to use the weapon, and at most showed that she knew Villani had access to an operable rifle and bullets, and not that he would use the rifle during the robbery; the exchanges occurred over two weeks apart and the first exchange took place three weeks before the robbery; no evidence suggested that Villani contemplated robbing Patel at the time of either text exchange, or that

Petitioner was aware that Villani planned an unarmed robbery at that time; in the first exchange, instead of approving of any future use of the rifle, Petitioner begged her boyfriend not to clean the rifle again; Villani purchased marijuana from Patel after the first exchange (thereby confirming that no such robbery was then contemplated), and, in the second exchange, her reference to cleaning the bullets merely referred to casings in Villani's house (and not any future use of the firearm). (ECF No. 1-1 at 4; ECF No. 17 at 1-2, 10-14.)

According to Petitioner, Respondents argue that the Weapon Convictions can be sustained even if the evidence merely showed that she knew that Villani had "access" to the rifle, which is inconsistent with controlling state court precedent dictating that, to be convicted of armed robbery and the other weapons-based offenses, an accomplice must share the perpetrator's purpose of committing the robbery with a weapon (and accordingly knowledge that Villani had mere "access" to a weapon was legally insufficient). (ECF No. 17 at 3.) In addition, the trial court instructed the jury that, to find Petitioner guilty on the armed robbery charges, it had to find that Villani had "immediate access" to the rifle, *i.e.*, that it was easily accessible and readily available for use during the robbery. (ECF No. 1-1 at 3.) However, Petitioner contends that no evidence suggested that she knew Villani would have immediate access to the rifle during the robbery; on the contrary, she understood that the weapon was stored in his father's bedroom closet, and there was purportedly no indication that she was aware Villani would remove the weapon to use it to rob the victim (in the garage). (ECF No. 17 at 13-15.)

Noting that the Appellate Division cited Kacandes's testimony about his conversations with Villani and Petitioner, Petitioner further contends this testimony actually undermined any suggestion that she knew that Villani intended to commit armed robbery because, prior to the robbery, Villani and Petitioner indicated to Kacandes that Villani planned to beat up Patel and trap

24

the victim in the garage (and not to arm himself with the rifle kept in Villani's father's bedroom closet) and, after the crime was committed, Petitioner told Kacandes that her boyfriend had told her that he punched Patel so hard that Patel dropped to the floor. (ECF No. 1-1 at 4-5; ECF No. 17 at 2.) According to Petitioner, Kacandes's testimony that, after Villani was charged with armed robbery and murder, "[Petitioner] 'was frantic, very, very upset,' and told Kacandes 'I can't believe I was dating a murderer,'" which allegedly confirmed that she had no prior knowledge that Villani intended to use the rifle during the robbery and that she was shocked to learn afterwards that he had done so. (ECF No. 1-1 at 5.)

According to Petitioner, the Appellate Division made no attempt to cite any evidence that Petitioner conspired with Villani to commit armed robbery and that, "[i]ndeed, the court ignored undisputed evidence establishing the opposite, such as a text message by which [Petitioner] broke up with Villani approximately 90 minutes before the robbery." (*Id.*) Petitioner indicates that "the mere fact that she did so suggests that she objected to some aspect of the crime he was about to commit, not that she was conspiring with him to commit it or purposely aiding his commission of it." (*Id.* at 5-6.)

Petitioner also claims that any post-robbery evidence of her limited assistance to conceal her boyfriend's crimes did not suggest that Petitioner knew <u>beforehand</u> that Villani would arm himself during the robbery. (ECF No. 17 at 16-17.) On the contrary, the evidence of Petitioner's conduct after the robbery purportedly confirmed that she did not learn Villani would arm himself until after the shooting. (*Id.*)

However, while Petitioner's arguments could have potentially persuaded a reasonable jury to acquit Petitioner, "*Jackson* leaves juries broad discretion in deciding what inferences to draw from the evidence at trial, requiring only that jurors 'draw reasonable inferences from basic facts

to ultimate facts.'" *Coleman*, 566 U.S. at 655 (quoting *Jackson*, 443 U.S. at 319).  Under *Jackson*, a conviction violates due process only if—considering the totality of both the direct and circumstantial evidence and giving the prosecution the benefit of every reasonable inference that can be drawn from the evidence—no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  *See Jackson*, 443 U.S. at 319, 324-26.  "[A] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* at 326 (explaining that the Supreme Court had rejected the theory that the prosecution must affirmatively rule out every hypothesis except guilt beyond a reasonable doubt).

Accordingly, in *Jackson*, the United States Supreme Cout concluded that, "[f]rom the circumstantial evidence in the record, it is clear that the trial judge could reasonably have found beyond a reasonable doubt that the petitioner did possess the necessary intent [to kill] at or before the time of killing" because the uncontradicted evidence established that he shot the victim twice, the fatal shooting occurred after the petitioner had fired several shots into the ground and reloaded, the two shots were fired at close and predictably fatal range by a person with experience in the use of the firearm, after the shooting, the petitioner drove without mishap from Virginia to North Carolina (despite his claim of extreme intoxication), and shortly before the shooting, he expressed an intention to have sexual relations with the victim (and her body was found partially unclothed). *Id.* at 325.  The *Jackson* Court concluded that the petitioner's claim of self-defense would have required the fact-finder to draw a series of implausible inferences from the basic facts, specifically that he was wholly uninterested in sexual activity but that the decedent was so interested as to have willingly removed a piece of her clothing and then attacked him with a knife when he resisted her

advances despite the fact he was armed with a loaded revolver he had just demonstrated he knew how to use. *Id.* It was evident that the trial judge found this story (and the claim that he was so intoxicated he was incapable of premeditation) incredible. *Id.* Deferring to the trier of fact's resolution of the factual conflicts, the Court held that "a trier of fact could reasonably have found that the petitioner committed murder in the first degree under Virginia law." *Id.* at 326.

"This deferential [*Jackson*] standard does not permit the type of fine-grained factual parsing" that Petitioner suggests. *Coleman*, 566 U.S. at 655. In sum, "[t]he opinion of the Court in [*Jackson*] makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos*, 565 U.S. at 2.

In addition, Petitioner's *Jackson* claim is subject to another layer of deference under AEDPA. It is well established that § 2254(d) is "highly deferential" and "difficult to meet," *Pinholster*, 563 U.S. at 181 (citations omitted), and the statutory provision bars relief so long as "'fair-minded jurists could disagree' on the correctness of the state court's decision," *Harrington*, 562 U.S. at 101 (citation omitted). Habeas relief is precluded unless the state court's decision was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington*, 562 U.S. at 103.

"[O]n habeas review, 'a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable."'" *Coleman*, 566 U.S. at 651 (quoting *Cavazos*, 565 U.S. at 2). "Because rational people can sometimes disagree," *Cavazos*, 565 U.S. at 2, an "'inevitable consequence' of this

double deference 'is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold,'" *Eley*, 712 F.3d at 853 (quoting *Cavazos*, 565 U.S. at 2).

As the Third Circuit explained in *Eley*, "[h]ad we been the jury, we might have acquitted Eley; had we been the [Pennsylvania] Superior Court, we might even have reversed his conviction. But applying our doubly deferential standard of review, we simply cannot conclude that it was objectively unreasonable for the Superior Court to decide that a rational jury could have found Eley guilty of second-degree murder, robbery, and conspiracy to commit robbery beyond a reasonable doubt." *Id.* at 853 (citation omitted).

Applying the doubly deferential standards mandated by *Jackson* and AEDPA, the Court concludes that viewing the evidence in the light most favorable to the prosecution, giving the prosecution the benefit of every reasonable inference to be drawn from this evidence, and resolving every factual dispute in the prosecution's favor, a rational juror could find beyond a reasonable doubt that Petitioner "knew – <u>before</u> Villani robbed and killed Patel – that he intended to use his father's rifle during the robbery and that she conspired with him to commit, or purposely aided him in committing, that <u>armed</u> robbery" (ECF No. 1-1 at 3). In any event, it was not objectively unreasonable for the Appellate Division to decide that a rational jury could have found Petitioner guilty beyond a reasonable doubt on the weapons-related charges.[4]

---

[4]    Petitioner acknowledges that the state felony murder statute "proscribes one who causes another death while committing the crime of 2nd-degree [unarmed] robbery in addition to the crime of 1st-degree armed robbery." (ECF No. 1-1 at 32 n.4.) According to Petitioner, because the jury was not instructed that it could convict Petitioner of felony murder if it found her guilty of having committed the crime of second-degree robbery, the New Jersey state courts could not (and did not) sustain her felony murder conviction on the grounds that there was sufficient evidence establishing that she committed the crime of second-degree (unarmed) robbery. (*See* ECF No. 17 at 5-6); *see also Chiarella*, 445 U.S. at 236-37 (indicating that a conviction violates due process if it rests on a legal or factual theory that was never presented to the jury). Respondents

### a.    Count Three

The Court begins its analysis with Count Three.  As Petitioner acknowledges, this second-degree conspiracy charge "required the State to prove that [she] agreed with Villani to commit the armed robbery charge. . . and purposely promoted or facilitated those charges."  (ECF No. 1-1 at 32 (citations omitted).)  Under *Jackson,* a reasonable jury could find beyond a reasonable doubt that Petitioner, with the purpose of promoting or facilitating the commission of the crime of armed robbery, either agreed with Villani that either he, she, or they would engage in conduct constituting armed robbery, or agreed to aid Villani in the planning or commission of the armed robbery.

As the Appellate Division observed, "the State provided proofs which included" "multiple text messages that were sent between [Petitioner] and Villani regarding a rifle, and specifically a text sent by [Petitioner] to Villani, which said '[y]ou need to clean the bullets.'"  *Garajau*, 2021 WL 1750140, at *6.  The prosecution presented text messages exchanged between Petitioner and Villani discussing Villani checking on and cleaning the firearm and "bullets" that was subsequently used to shoot and kill Patel.  On January 19, 2017, Villani texted Petitioner: "Rifle works" and "Got the bullets too."  (Aug. 15, 2018 Tr. at T43:17-19 (A_2123).)  Petitioner asked why Patel was cleaning a gun.  (*Id.* at T43:17-44:3 (A_2123).)  Villani responded: "Just to

---

contend that, because a defendant need not have contemplated or intended the victim's death to be guilty of felony murder, and "robbery" is one of the underlying felonies specified in the felony murder provision, "petitioner did not have to know prior to the commission of the robbery that Villani intended to use the loaded rifle in the course of the robbery."  (ECF No. 16 at 42.)  Because the Appellate Division reasonably determined that the evidence was sufficient to sustain the first-degree (armed) robbery conviction, the Court need not (and does not) rule on whether the felony murder conviction could be sustained if Petitioner knew only that Villani would commit an unarmed robbery.

Furthermore, "[Petitioner] readily concedes that the State did not have to prove that she knew Villani intended to fire the rifle or to shoot Patel during the robbery."  (ECF No. 17 at 5 n.2.)  Instead, Petitioner contends that the prosecution had to prove that she knew Villani would "use" the rifle by arming himself with it during the robbery.  (*Id.*)

understand it." "Didn't shoot it." "I cleaned it." "Watched YouTube." (*Id.* at T43:22-25 (A_2123).) On February 2, 2017, four days before the fatal robbery, Petitioner texted Villani: "You need to clean the bullets" and Villani answered, "No shit." (*Id*. at T52:8-53:12 (A_2132-33) [add his response).)

Considering all of the evidence presented against Petitioner (viewed in the light most favorable to the prosecution), the texts gave rise to a reasonable inference that Petitioner knew Villani possessed a functional firearm and ammunition and that she anticipated, approved of, and agreed to the firearm's use in their planned robbery of Patel.

In fact, as Petitioner acknowledges (ECF No. 1-1 at 7), Petitioner and Villani were in a romantic relationship, having started dating around the summer of 2016, and they often sold marijuana together. (Jul. 25, 2018 Tr. at T13:19-14:11, T16:12-25 (A_0228-29, A_0231); Jul. 26, 2018 Tr. at T10:13-12:3 (A_0359-61); Aug. 8. 2018 Tr. Vol. I at T84:8-18 (A_1556)); *Garajau*, 2021 WL 1750140, at *1 (stating that Petitioner appeals from her convictions stemming from her role in the death of the victim, "who was shot during a robbery committed by her codefendant boyfriend"). Petitioner and Villani had a close, but troubled relationship (because Petitioner was "very controlling"), and the couple communicated with each other between thirty to two hundred times a day. (Jul. 25, 2018 Tr. at T10:25-11:11, T12:2-16 (A_226-27); Aug. 9, 2017 Tr. at 185:20-187:23 (A_1892-94).)

Furthermore, approximately one week before the first text exchange regarding the rifle, Petitioner was present at the tavern with Villani and Patel and texted Villani, "What is the next step. Should we follow?" (Aug. 8, 2018 Tr. Vol. I at T96:21-97:8, T98:1-24, T107:1-24, T113:2-13 (A_1568-70, A_1579, A_1585); Aug. 16, 2018 Tr. at T85:24-86:15 (A_2340-41)). A jury

30

could reasonably construe this message as Petitioner signaling her participation in surveilling or following the intended victim.

Subsequently, one day after the text exchange regarding the bullets, on February 3, 2017, Petitioner texted Villani, "I didn't get paid for a full week and have no gas" and "I'm just stressed – the hell out RN [right now] about money." (*Id.* at 56:22-57:1 (A_2135-36).)  On the following day (the day before the robbery), Petitioner and Villani spoke with Kacandes about the couple's plan to commit a robbery.  *See Garajau*, 2021 WL 1750140, at *6.  Petitioner warned Kacandes not to buy marijuana that night because Villani would be "robbing someone tomorrow." (Jul. 25, 2018 Tr. at T18:3-19 (A_0233).)  Villani then described to their friend the plan to trap the victim in a garage.  (*Id.* at T23:8-18 (A_0238).)  In addition, it is undisputed that the rifle, which was tested and was found to be functional, was kept at the same house.  (*See* ECF No. 1-1 at 8.)

On the date of the armed robbery, Petitioner and Villani remained in almost constant contact, and Petitioner was, at the very least, in close proximity to the crime scene.  Shortly before the robbery occurred, Petitioner texted Villani that she wanted to break up, and he responded by telling her to leave.  (Aug. 15, 2018 Tr. at T66:17-23 (A_2146).)  However, fifteen minutes later, Petitioner texted Villani that she would come back after class; she missed her 2:00 p.m. class, lied to her sister about her whereabouts, and was back in her boyfriend's cell coverage encompassing Villani's house by 2:23 p.m.; and, at 3:33 p.m., Patel's phone was within Villani's (and Petitioner's) cell coverage area, a neighbor heard three gunshots, and testimony from the medical examiner and Wobser established that Patel was shot three times.  (Jul. 25, 2018 Tr. at T120:18-122:4 (A_0335-37); Aug. 8, 2018 Tr. Vol. I at T155:2-12 (A_1627); Aug. 14, 2018 Tr. at T88:1-20 (A_1991); Aug. 15, 2018 Tr. at T66:17-23, 67:22-69:2 (A_2146, A_2147-49)); *Garajau*, 2021 WL 1750140, at *6.

Petitioner attempts to minimize the extent of her involvement in the efforts to dispose of evidence of the fatal robbery, asserting, among other things, that she only took "limited" steps to help to conceal the crime.[5] (ECF No. 1-1 at 5.) However, Petitioner demanded that Villani take actions to conceal, and personally benefited from, the fatal armed robbery and even joked about "getting away with murder." "It is universally conceded today that the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself." *State v. Williams*, 190 N.J. 114, 125 (2007) (quoting 2 *Wigmore on Evidence* § 276 (Chadbourn rev. 1979))). The New Jersey Supreme Court has "recognized the relevance of post-crime conduct to a defendant's mental state when the conduct demonstrates a consciousness of guilt." *Id.* In fact, in *Jackson*, the United States Supreme Court relied on post-crime conduct to conclude that there was sufficient circumstantial evidence to support the jury's finding that the petitioner had a specific intent to kill the victim. *See Jackson*, 443 U.S. at 325 ("Immediately after the shooting, the petitioner drove without mishap from Virginia to North Carolina, a fact quite at odds with his story of extreme intoxication."). According to *Jackson, "*the petitioner's calculated behavior both before and after the killing demonstrated that he was fully capable of committing premeditated murder." *Id.*

In the present matter, Petitioner, among other steps taken to conceal the fatal shooting of Patel, texted Villani: "Bleach." "Take your time bleaching everything." "Take that bag of stuff out

---

[5]    Petitioner also suggests that Villani threatened to kill her and her family unless she helped him attempt to conceal his crime (ECF No. 1-1 at 13; ECF No. 17 at 17 n.4); however, Petitioner acknowledges that "no evidence of such threats were presented at trial" (ECF No. 1-1 at 13), and it is well established that this Court's review of the objective reasonableness of the Appellate Division's ruling is limited to the record before the state court that adjudicated the claim on the merits, *see Pinholster*, 563 U.S. at 181.

'cause I touched his phone. We will throw that stuff in the Ocean." "[W]ipe down the car." "Babe you need to move the car. Its too important." "Like ASAP." and "People will start noticing he's not answering." (Jul. 25, 2018 Tr. at T112:12-21 (A_2192); Aug. 15 2018 Tr. at T89:140-18 T104:8-05:6, T106:11-12, T110:22-111:11, T112:12-21; T137:5-25 (A_2169, A_2184-86, A_2190-92).) Petitioner threatened to break up with Villani if he did not move Patel's car. ((*Id.* at T121:2-3 (A_2201).).) After the robbery, Petitioner and Villani told Kacandes that they took a pound of marijuana and $2,000 in cash from Patel's vehicle. (Jul. 25, 2018 Tr. at T30:18-31:13, T32:3-11 (A_0245-46, A_0247A).) Petitioner also had in her possession a new pair of Louboutin shoes and a gold Pandora ring. (*Id.* at T41:1-19 (A_0256).)

Finally, after Villani cleaned the crime scene and disposed of Patel's body and car (and before the body and vehicle were discovered by law enforcement), Petitioner's employer received an anonymous email stating that "[t]o get away with murder the best cause is with a smile" and, less than fifteen minutes later, Petitioner similarly texted Villani that "[t]he best way to get away with murder is with a smile." (Aug. 15, 2018 Tr. at T151:10-24 (A_2231); Sept. 4, 2018 Tr. at T61:3-62:3, T64:19-69:25 (A_2231, A_2500-05).) As the Appellate Division noted in its rejection of Petitioner's challenge to the prosecution's opening statement addressing the text message, given its timing, "reasonable minds could view the text message as inculpatory evidence even if there was other evidence presented that the text message was about something that had happened at defendant's workplace." *Garajau*, 2021 WL 1750140, at *22. Similarly, the Appellate Division determined that the prosecutor properly referred to this message in the closing statement on the grounds that:

> As previously discussed, however, the text message was sent the day before the body was discovered and two weeks after the murder. Given the timing of the message, reasonable minds could view the text message as inculpatory evidence. Defense counsel was free to

33

> argue alternatively, and he did. Thus, there was nothing improper
> about the prosecutor arguing that this text was made in reference to
> the victim's death.

*Id.* at *23. Under the circumstances, a reasonable juror could infer these statements were inculpatory in nature.

Based on the evidence summarized above, viewing the evidence in the light most favorable to the prosecution, giving the prosecution the benefit of every reasonable inference to be drawn from this evidence, and resolving every factual dispute in the prosecution's favor, the Court cannot conclude that *no* rational trier of fact could have found beyond a reasonable doubt that Petitioner, with the purpose of promoting or facilitating the commission of the crime of armed robbery, either agreed with Villani that either he, she, or they would engage in conduct constituting armed robbery, or agreed to aid Villani in the planning or commission of the armed robbery, In any event, even if the Court might have acquitted Petitioner or vacated her conviction if it had been the jury or the Appellate Division, "applying our doubly deferential standard of review, we simply cannot conclude that it was objectively unreasonable for the [Appellate Division] to decide that a rational jury could have found [Petitioner] guilty of [conspiracy to commit armed robbery] beyond a reasonable doubt," *Eley*, 712 F.3d at 853 (citation omitted).

Petitioner analogizes this case to *Travillion v. Superintendent Rockview SCI*, 982 F.3d 896 (3d Cir. 2020), arguing that the absence of any evidence she knew and shared Villani's intent to commit armed robbery renders the Appellate Division's sufficiency of the evidence determination objectively unreasonable under clearly established federal law. (*See* ECF 17 at 17-18.) In *Travillion*, the Third Circuit reversed the district court's denial of habeas relief and concluded that "[i]t was objectively unreasonable [for the Pennsylvania Superior Court] to apply the *Jackson* standard and deny relief on Travillion's claim that there was insufficient evidence to support a

conclusion that Travillion was the robber that carried the folder and paper during the commission of the crime beyond a reasonable doubt." 982 F.3d at 906. "Any determination that Travillion's fingerprints were left on the folder and paper during the commission of the offense is unreasonably speculative." *Id.* (footnote omitted).

Unlike *Travillion*, the case against Petitioner did not depend on unreasonable speculation. As explained above, in this case, the prosecution presented text messages, particularly messages exchanged by Petitioner and her boyfriend Villani regarding the rifle he used in the fatal robbery, cell site evidence, eyewitness accounts, and evidence of Petitioner's own inculpatory actions and statements following the robbery, all of which, under *Jackson* and AEDPA, could result in "a fair-minded jurist" agreeing with the Appellate Division's determination that a jury could reasonably find Petitioner guilty of conspiracy to commit armed robbery, *Harrington*, 562 U.S. at 101 (quoting *Yarborough*, 541 U.S. at 664).

Accordingly, the Court rejects Petitioner's challenge to the state court's disposition of her *Jackson* challenge to her conviction on Count Three.

### b. Count Four

The Appellate Division concluded that the same proofs supporting the conspiracy to commit armed robbery count also supported Petitioner's conviction on Count Four (armed robbery). *Garajau*, 2021 WL 1750140, at *6. Under state law, *see Coleman*, 566 U.S. at 655 (stating that federal courts look to state law for the substantive elements of the criminal offense), Petitioner could be convicted of armed robbery (Count Four) as either Villani's accomplice or his co-conspirator, *e.g.*:

> As to count four, the judge correctly charged the jury with the model jury charge on accomplice liability as well as co-conspirator liability. Indeed, if the facts support liability as an accomplice or a co-conspirator, each theory supported by the facts

should be charged to the jury, and the jury need not agree on the basis for liability to convict the defendant of the substantive crime. State v. Roach, 146 N.J. 208, 223, 680 A.2d 634 (1996) (noting that "[w]hen a defendant may be found guilty either as a principal actor or as an accomplice, the jury should be instructed about both possibilities"). Therefore, not only was the jury charge correct, but so was the verdict sheet, especially considering that the jury's finding of guilt based on one theory of liability or another did not affect gradation of the offense or sentencing. Ibid.; see also State v. Diaz, 144 N.J. 628, 643-45, 677 A.2d 1120 (1996) (providing examples of when special verdict sheets should be used).

Contrary to defendant's argument, liability for substantive crimes committed by co-conspirators is distinguishable from liability for conspiracy to commit those same crimes. Compare N.J.S.A. 2C:5-2 with N.J.S.A. 2C:2-6(b)(4). A person may be convicted of conspiracy to commit a crime only if he or she intended to promote or facilitate the commission of that crime. N.J.S.A. 2C:5-2. Liability as a co-conspirator for the substantive crime is significantly broader. State v. Roldan, 314 N.J. Super. 173, 188, 714 A.2d 351 (App. Div. 1998). Thus, it was not misleading or confusing for the judge to instruct the jury on co-conspirator liability, as it pertained to count four, in addition to conspiracy to commit a crime, as it pertained to count three.

The Court has already concluded that there was sufficient evidence to sustain Petitioner's conviction for conspiracy to commit armed robbery under Count Three and that, even if the Court were to conclude that the evidence was insufficient, the Appellate Division nonetheless reasonably applied *Jackson* rejecting Petitioner's challenge to her conviction for conspiracy to commit armed robbery in Count Three. *See supra* Section III.A.3.a. Accordingly, the Court must reject Petitioner's challenge to her conviction on Count Four.

The Appellate Division also determined that "the State presented multiple pieces of evidence suggesting that defendant did act as Villani's accomplice, and, therefore, the judge correctly denied defendant's motion for a judgment of acquittal on those [accomplice] counts as well." *Garajau*, 2021 WL 1750140, at *7. For substantially the same reasons that this Court has concluded that a reasonable jury could find under the deferential *Jackson* standard that Petitioner

was guilty beyond a reasonable doubt of conspiracy to commit armed robbery, *see supra* Section III.A.3.a., a jury could reasonably return a guilty verdict on a charge that, as her boyfriend's accomplice, Petitioner "knew that 'Villani was armed with or used or threatened the immediate use of a deadly weapon' during the robbery and purposely aided the armed robbery" (ECF No. 1-1 at 31 (citations omitted)).  Specifically, considered together with the totality of the evidence presented against Petitioner (viewed in the light most favorable to the prosecution), the text messages gave rise to a reasonable inference that Petitioner knew Villani possessed a functional firearm and ammunition and that she anticipated, approved of, and agreed to the firearm's use in their planned robbery.  In addition to the text messages, the prosecution presented evidence, *inter alia,* of a close "controlling" relationship between Petitioner and Villani; Petitioner's knowledge of, and participation in, preparing and planning for the robbery (*e.g.*, expressing her willingness to surveil Patel and telling Kacandes not to buy marijuana because Villani was planning on robbing someone the next day); and, around the time of the fatal robbery, she failed to go to class, lied to her sister regarding her whereabouts, and was in close proximity to the scene of the crime.  Furthermore, after Patel was shot and killed, Petitioner aggressively encouraged and assisted in efforts to cover up the homicide and, after the evidence of their crimes was apparently disposed of, said "the best way to get away with murder is with a smile."  In any event, given such evidence, it was not objectively unreasonable under AEDPA for the Appellate Division to uphold Petitioner's conviction on Count Four.

c.    **Count Five**

According to the Appellate Division, the "same proofs" supporting the conspiracy to commit armed robbery and robbery charges "also supported the felony murder count."  *Garajau*, 2021 WL 1750140, at *6  Petitioner notes that "[t]he first-degree felony murder charge (Count

Five) required the State to prove, among other elements, that [Petitioner] was 'Villani's accomplice in committing the crime of armed robbery as charged' when Villani shot and killed Patel." (ECF No. 1-1 at 31-32 (citations omitted).) The trial court instructed the jury that it could not find Petitioner guilty of felony murder unless it found her guilty of committing the crime of robbery charged in Count Four. (Sept. 6, 2018 Tr. at 62:4-7 (A_2731).) "[T]he jury finding of guilt must be for the felony itself based on a charge of liability, such as co-conspirator liability or accomplice liability." *Garajau*, 2021 WL 1750140, at *8 (citing *State v. Grey*, 147 N.J. 4, 15-18 (1996)). As the Court has explained in Section III.A.3.b., *supra*, there was sufficient evidence under *Jackson* to support the armed robbery conviction under either an accomplice or a co-conspirator theory of liability, and, in any event, it was not objectively unreasonable for the Appellate Division to sustain this armed robbery conviction. Accordingly, the Court likewise rejects Petitioner's challenge to Count Five.[6]

### d.    Count Ten

Petitioner states that Count Ten required the prosecution to prove that Petitioner agreed with Villani to commit the weapon possession charge and purposely promoted or facilitated the

---

[6]    As part of Petitioner's argument that she had to know prior to the commission of the robbery that Villani intended to use the rifle in the course of the robbery because (unarmed second-degree) "robbery" is one of the underlying felonies specified in the felony murder provision, Respondents note that the "non-slayer affirmative defense" was submitted to the jury. (ECF No. 16 at 45-48). According to Respondents, the evidence adduced at trial amply supported the jury's rejection of the third prong of this defense (*i.e.,* "Had no reasonable ground to believe that any other participant was armed with such a weapon, instrument, article or substance," N.J. Stat. Ann. § 2C:11-3a(3)(c)). (*Id.*) Petitioner insists that "[t]he State's reliance on the non-slayer affirmative defense to felony murder is misplaced" and a "red herring" because (although "the evidence plainly establishes that [she] had no ground to believe that Villani would be armed with his father's rile during his solo robbery of Patel") the real "issue" is whether the prosecution carried its burden of proving beyond a reasonable doubt that Petitioner was guilty of armed robbery. (ECF No. 17 at 9-10.) However, for the reasons stated in Section III.A.3.b., the Court has rejected Petitioner's challenge to her armed robbery conviction.

charge.  (ECF No. 1-1 at 32.)  For substantially the same reasons that the Court has concluded that there was sufficient evidence to support the conviction on the charge of conspiracy to commit armed robbery, *see supra* Section III.A.3.a., the Court also concludes that this evidence is sufficient for purposes of sustaining her similar conviction for conspiracy to possess a weapon for an unlawful purpose.  The prosecution presented evidence of not only the text messages regarding the rifle and bullets but also, among other things: (1) the "controlling" relationship between Petitioner and Villani; (2) Petitioner's knowledge of, and participation in, preparing and planning the robbery; (3) her conduct on the day of the fatal robbery; (4) her subsequent role in covering up the homicide; and (5) her message to Villani that the best way to get away with murder is with a smile.  Viewing the evidence in the light most favorable to the prosecution, as well as resolving all factual disputes and drawing all reasonable inferences in favor of the prosecution, a reasonable jury could find beyond a reasonable doubt that Petitioner agreed with Villani to commit the offense of possession of a weapon for an unlawful purpose.  Even if the Court would have ruled differently than the Appellate Division, the Court cannot conclude that the Appellate Division unreasonably applied *Jackson* to uphold Petitioner's weapons-related conspiracy conviction in Count Ten.

### e.    Count Eleven

Finally, Petitioner notes that the charge of possession of a weapon for an unlawful purpose required the State to prove that she "knew that Villani possessed a firearm, intended to use it unlawfully against Patel, and purposely aided that unlawful use."  (ECF No. 1-1 at 32 (citations omitted))  The trial court instructed the jury that it could find Petitioner guilty on Count Eleven under either a co-conspirator or an accomplice theory of liability.  (*See* Sept. 6, 2018 Tr. at 118:15-18 (A_2759)); *Garajau*, 2021 WL 1750140, at *8.  The Court has already concluded that there was sufficient evidence to sustain Petitioner's conviction for conspiracy to possess a weapon with an

unlawful purpose and that, even if it were to conclude that the evidence was insufficient to support the conspiracy conviction, the Appellate Division reasonably applied *Jackson* rejecting Petitioner's challenge to her conviction on Count Ten. *See supra* Section III.A.3.d. Furthermore, for substantially the same reasons that this Cout has concluded that a reasonable jury could find under the deferential *Jackson* standard that Petitioner was guilty beyond a reasonable doubt of conspiracy to possess a weapon for an unlawful purpose, a jury could reasonably return a guilty verdict on a charge that, as her boyfriend's accomplice, Petitioner knew that Villani possessed a firearm, intended to use it unlawfully against Patel, and purposely aided that unlawful use. Again, the Court notes that the prosecution presented evidence including the text messages regarding the firearm and ammunition; the relationship between Petitioner and Villani and her role in preparing for and planning the robbery; her conduct at the time of the fatal robbery; and Petitioner's incriminating behavior and statements following the fatal shooting. Furthermore, it was not objectively unreasonable for the Appellate Division to conclude that the prosecution presented sufficient evidence to prove that Petitioner acted as Villani's accomplice on the weapon possession count. *Garajau*, 2021 WL 1750140, at *7.

### B.    Certificate of Appealability

Under 28 U.S.C. § 2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of his state court conviction unless he has "made a substantial showing of the denial of a constitutional right." "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). The Court finds that jurists of reason could disagree with this Court's resolution of Petitioner's sole

claim for habeas relief that "[t]he New Jersey state courts' rejection of [Petitioner']s insufficient evidence challenges to the Weapon Convictions is objectively unreasonable under clearly established federal law" (ECF No. 1 at 5; ECF No. 1-1.), and that the issues raised by Petitioner deserve encouragement to proceed further. *See Eley*, 712 F.3d at 845 (noting that certificate of appealability was granted because claims were adequate to deserve encouragement to proceed further). As such, a certificate of appealability is granted as to Petitioner's claim for relief.

## IV.    CONCLUSION

For the reasons stated above, and other good cause shown, the Petition is **DENIED**. A certificate of appealability shall issue. An appropriate Order will be entered.

_____
**GEORGETTE CASTNER**
**United States District Judge**

Dated: February 24, 2026